**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                  )
JUDICIAL WATCH, INC.,             )
                                  )
            Plaintiff,            )
                                  )
       v.                         ) Civil Action No. 13-1759 (EGS)
                                  )
INTERNAL REVENUE SERVICE,         )
                                  )
            Defendant.            )
_____)

<u>**MEMORANDUM OPINION**</u>

Judicial Watch requested information from the Internal Revenue Service ("IRS") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. The IRS conducted what it considers to have been a reasonable search in response to that request, but found no responsive records. The IRS therefore moves for summary judgment, arguing that it has discharged its FOIA responsibilities. Judicial Watch opposes this motion and proposes ways in which the IRS could have conducted a more appropriate search. Upon consideration of the motion, the response and reply thereto, the applicable law, and the entire record, the Court **GRANTS** the motion for summary judgment.

**I.  Background**

**A.  The May 22, 2013 FOIA Request and this Lawsuit.**

On May 22, 2013, Judicial Watch submitted to the IRS a FOIA request for:

> Any and all records and communications concerning, regarding, or related to the selection of individuals for audit based on information contained in 501(c)(4) tax exempt applications.

Compl., ECF No. 1 ¶ 5. "The time frame of the request was identified as being 'January 1, 2010 to the present.'" *Id.*

On June 25, 2013, the IRS acknowledged that it had received the request and advised that it would be unable to finish processing the request on time and therefore had "'extended the response date to August 16, 2013.'" *Id.* ¶ 6. An August 13, 2013 letter from the IRS indicated that the IRS required additional time and would contact Judicial Watch by September 27, 2013 if it remained unable to complete processing of the request. *See id.* ¶ 7. Having received no further response, Judicial Watch filed suit on November 8, 2013. *See id.* ¶ 8.

After the case was filed, the parties submitted a series of status reports. *See* Meet and Confer Report, ECF No. 11; Status Report, ECF No. 12. On August 6, 2014, they filed a joint status report indicating that the IRS believed that "it had conducted a reasonable search which did not locate any responsive records," while Judicial Watch felt that "there is a genuine issue of material fact regarding whether the Service has satisfied its obligations." Status Report, ECF No. 18 at 1. At the parties' request, the Court set a schedule for the briefing of a motion for summary judgment. *See* Minute Order of August 6, 2014.

On September 22, 2014, the IRS filed its motion for summary
judgment. *See* Mot. for Summ. J. ("Mot."), ECF No. 19. The IRS
also submitted a statement of facts in support of that motion.
*See* IRS Statement of Facts ("Def.'s SMF"), ECF No. 19-1. On
October 22, 2014, Judicial Watch filed its opposition to the
motion for summary judgment along with a response to the IRS's
statement of facts. *See* Opp. to Mot. ("Opp."), ECF No. 20;
Judicial Watch Statement of Facts ("Pl.'s SMF"), ECF No. 20-1.
On November 21, 2014, the IRS filed a reply brief, along with a
brief response to Judicial Watch's statement of facts. *See* Reply
in Supp. of Mot. ("Reply"), ECF No. 23; IRS Reply SMF, ECF No.
23-1. The IRS's motion is ripe for adjudication.

**B.    Organization of the IRS.**

To understand the search conducted by the IRS in response to
Judicial Watch's FOIA request, it is necessary to describe the
structure of the IRS. The IRS "is mainly organized around four
distinct operating divisions." Def.'s SMF ¶ 2; Pl.'s SMF ¶ 2.
These divisions are: (1) the Wage and Investment Division, which
"serves individual taxpayers . . . with wage and investment
income only"; (2) the Small Business/Self-Employed Division,
which focuses on taxpayers that are either small businesses or
self-employed; (3) the Large & Mid-Size Business Division, which
works with "corporations with assets greater than $10 million"
as well as business and individuals with certain international

focuses; and (4) the Tax Exempt and Government Entities Division, which "serves three distinct taxpayer segments: Employee Plans, Exempt Organizations, and Government Entities." Def.'s SMF ¶¶ 3-7; Pl.'s SMF ¶¶ 3-7.

"All applications for tax exempt status" under Section 501(c)(4), "are processed by the Rulings and Agreements Office within the Exempt Organizations Unit of [the Tax Exempt and Government Entities Division]." Def.'s SMF ¶ 8; Pl.'s SMF ¶ 8. The Tax Exempt and Government Entities Division does not conduct any audits of individuals, however. *See* Def.'s SMF ¶ 9; Pl.'s SMF ¶ 9. Individual audits are conducted by one of the three other divisions. *See* Def.'s SMF ¶ 10; Pl.'s SMF ¶ 10. Naturally, then, if information on a 501(c)(4) application caused the Tax Exempt and Government Entities Division to think that an individual audit was warranted, the Division would need to refer the individual to another division for such an audit. *See* Def.'s SMF ¶ 35, 50, 68, 86; Declaration of Dagoberto Gonzalez ("Gonzalez Decl."), ECF No. 19-3 ¶ 6; Declaration of David Horton ("Horton Decl."), ECF No. 19-4 ¶ 4; Declaration of Cheryl Claybough ("Claybough Decl."), ECF No. 19-5 ¶ 4; Declaration of Karen Schiller ("Schiller Decl."), ECF No. 19-6 ¶ 5.

**C.    The IRS's Search for Records.**

In keeping with Judicial Watch's request for "[a]ny and all records and communications concerning, regarding, or related to

the selection of individuals for audit based on information
contained in 501(c)(4) tax exempt applications," Compl., ECF No.
1 ¶ 5, the IRS began its search by discerning whether any
individuals ever were selected for audit based upon information
in an application for tax-exempt status under Section 501(c)(4).
The IRS began with the Tax Exempt and Government Entities
Division—the recipient and reviewer of all applications under
Section 501(c)(4)—searching for records in "the recordkeeping
systems for examination referrals maintained by the Exempt
Organizations Unit," which would contain all "referrals arising
from records of organizations that have applied for tax exempt
status." Def.' SMF ¶¶ 18-21; Declaration of Tamera Ripperda
("Ripperda Decl."), ECF No. 19-2 ¶ 7. The IRS retrieved from
this recordkeeping system "a list of all referrals arising out
of applications for tax-exempt status," reviewed that list
manually "to identify all taxpayer names that were not clearly
organizations (creating a list of potential individuals)," and
finally obtained and reviewed the referral documentation for
these individuals "to determine if any referral arose from
information contained in an application . . . under [Section
501(c)(4)]." Def.' SMF ¶¶ 21-24; Ripperda Decl. ¶ 7. No
referrals of any individual for an audit due to information
contained in such an application were found. *See* Def.' SMF ¶¶
19, 25; Ripperda Decl. ¶ 7.

Having found that the Tax Exempt and Government Entities Division had no record of ever referring an individual for audit based upon information contained in a 501(c)(4) application, the IRS then conducted searches of records within the other three divisions. These searches confirmed the lack of records regarding any such referral during the relevant time period. *See* Def.' SMF ¶¶ 42, 58, 75, 130; Gonzalez Decl. ¶ 7; Horton Decl. ¶ 6; Claybough Decl. ¶ 6; Schiller Decl. ¶ 9.

Wage and Investment Division: Because the Wage and Investment Division would not have received 501(c)(4) applications directly, the IRS searched this division's records for any referrals from the Tax Exempt and Government Entities Division. Such referrals would have been sent to the Wage and Investment Division's Compliance Office. *See* Def.'s SMF ¶ 36; Gonzalez Decl. ¶ 6. The Wage and Investment Division records "[a]ll cases of individual audits opened . . . based upon a referral from another business unit" in the Audit Information Management System. *See* Def.'s SMF ¶ 37; Gonzalez Decl. ¶ 7. A search of the Audit Information Management System for any audits based upon referrals during the relevant timeframe revealed only audits that "concerned tip income received by casino employees." Def.'s SMF ¶ 41; Gonzalez Decl. ¶ 7.

Small Business/Self-Employed Division: Three offices within this division may audit an individual: Campus Compliance

Services, Specialty Programs, and Examination Field. *See* Def.'s
SMF ¶ 87; Schiller Decl. ¶ 5. Because this division would not
receive 501(c)(4) applications directly, the IRS searched for
instances in which these offices received referrals of
individuals for audit from the Tax Exempt and Government
Entities Division. *See* Def.'s SMF ¶¶ 85–88; Schiller Decl. ¶ 5.

In the Campus Compliance Services office, all audit referrals
are recorded in the Audit Information Management System. *See*
Def.'s SMF ¶ 89; Schiller Decl. ¶ 6. A search of this system for
"any audit of an individual arising from a referral from [the
Tax Exempt and Government Entities Division]" during the
relevant period revealed that "[n]o project code specifically
identifying referrals from [that division] has been used in the
last 5 years" and that no open or closed cases "had project
codes indicating a connection to [that division's] matters. *See*
Def.'s SMF ¶ 93; Schiller Decl. ¶ 6.

In the Specialty Programs office, different units record their
audit referrals in different ways (the Excise Tax Unit by
recording in the Specialist Referral System; the Estate and Gift
Tax Unit by tracking referrals in a spreadsheet; and the
Employment Tax Unit through a "computerized listing of open and
closed examinations"). *See* Def.'s SMF ¶¶ 97–98, 100, 105;
Schiller Decl. ¶ 7. A manual review of these systems revealed:
(1) that the Excise Tax Unit's system contained no referrals of

individuals from the Tax Exempt and Government Entities
Division; (2) that the Estate and Gift Tax Unit's spreadsheet
recorded 23 audits referred by the Tax Exempt and Government
Entities division, but the referrals all arose out of
information on the organization's annual tax return, not a
501(c)(4) application; and (3) that the Employment Tax Unit's
list included no open audits referred by the Tax Exempt and
Government Entities Division and that as many as 60 closed
audits were associated with a miscellaneous code that did not
identify which division referred them, but that obtaining more
information would require several months and a significant
amount of time to conduct a manual review. *See* Def.'s SMF ¶¶ 99,
101-04, 106-12; Schiller Decl. ¶ 7.[1]

In the Examination Field, audit referrals are processed in
seven different offices. *See* Def.'s SMF ¶ 116; Schiller Decl. ¶
8. One of these offices "maintains copies of all referrals sent
to it," "conducted a manual review of all the referrals it
received" during the relevant time period, and found "no

---

[1] The Employment Tax Unit also proffers that it is unlikely that
these closed audits were referred by the Tax Exempt and
Government Entities Division because the Unit rarely receives
referrals from that division, has no open audits that were
referred by that division, and "[t]he employee who receives and
reviews all referrals to Employment Tax, and who has been in
this position for 10 years . . . . had no recollection of ever
seeing a referral from [the Tax Exempt and Government Entities
Division] arising from information in [a 501(c)(4)
application]." Def.'s SMF ¶¶ 113-14; Schiller Decl. ¶ 7.

referrals of individuals received from [the Tax Exempt and Government Entities Division] based on information contained in [a 501(c)(4) application]." Def.'s SMF ¶¶ 117-19; Schiller Decl. ¶ 8. The other offices "maintain electronic spreadsheets" of all referrals. *See* Def.'s SMF ¶ 120; Schiller Decl. ¶ 8. Two of these spreadsheets record the source of the referral, and a review of these spreadsheets identified no referrals from the Tax Exempt and Government Entities Division based on information in a 501(c)(4) application. *See* Def.'s SMF ¶ 121; Schiller Decl. ¶ 8. In the other four, each office "contacted the Exam Group Manager responsible for each open examination that was based on a referral and was pending as of February 2014" and asked whether the referral came from the Tax Exempt and Government Entities Division and, if so, whether it was based upon information in a 501(c)(4) application. *See* Def.'s SMF ¶ 122; Schiller Decl. ¶ 8. No such cases were identified. *See* Def.'s SMF ¶ 122; Schiller Decl. ¶ 8.[2]

   Large and Mid-Size Business Division: Outside of individual audits based upon preexisting audits of corporations or

---

[2] For closed audits in those four offices, the only way to obtain information on the source of the referral would take months and involve many hours of review, and would be unlikely to succeed as no open audits exist that meet the same criteria, the offices that track closed audits had none that meet the relevant criteria, and group managers in the offices do not remember any referrals that would meet the criteria. *See* Def.'s SMF ¶ 123-29; Schiller Decl. ¶ 8.

partnerships, only two offices within this division have the authority to commence an audit of an individual: the International Individual Compliance Function and the Global High Wealth Function. *See* Def.'s SMF ¶ 48; Horton Decl. ¶ 2 & n.1. Because this division would not receive a 501(c)(4) application directly, the IRS searched for instances in which either office received referrals of individuals for audit from the Tax Exempt and Government Entities Division. *See* Def.'s SMF ¶¶ 49–50, 67–68; Horton Decl. ¶ 4; Claybough Decl. ¶ 4.

In the International Individual Compliance Function, the IRS searched the audit-tracking database of the Planning and Special Programs Office, which is the office to which all referrals would have been sent. *See* Def.'s SMF ¶¶ 51–55; Horton Decl. ¶¶ 4–5. That search revealed a list of all cases referred to the office, and a manual review of the list and information pertaining to each entity on the list "revealed that only one referral came . . . from [the Tax Exempt and Government Entities Division"—a referral that related "to a pension distribution." Def.'s SMF ¶¶ 56–57; Horton Decl. ¶ 5.

In the Global High Wealth Industry Group, all audit referrals are recorded in a database. *See* Def.'s SMF ¶¶ 69–70; Claybough Decl. ¶ 5. A search of that database revealed that only one referral for audit had come in from the Tax Exempt and Government Entities Division during the relevant time period,

and that "dealt with a defined retirement plan." Def.'s SMF ¶¶ 69–75; Claybough Decl. ¶¶ 5–6.

*     *     *

Based upon these searches, the IRS concluded that no audit referrals of individuals had been made during the relevant time period based upon any information contained in a 501(c)(4) application.

**D.   The IRS's Supplemental Searches.**

In November 2014, in response to concerns raised in Judicial Watch's opposition to the IRS's motion for summary judgment, the IRS conducted a supplemental search "for internal directives and guidelines regarding the selection of individuals for audit based on 501(c)(4) applications." Def.'s Reply SMF ¶ 5. The Director of the Exempt Organizations Unit of the Tax Exempt and Government Entities Division indicated that "[a]ny such documents would generally be located on the IRS [Tax Exempt and Government Entities] intranet website or in sections of the Internal Revenue Manual applicable to [the Tax Exempt and Government Entities Division]." Second Declaration of Tamera Ripperda ("Second Ripperda Decl."), ECF No. 23-2 ¶ 3. Ms. Ripperda directed a review of "the guidance, resources, and reference materials maintained on the . . . intranet website for any material pertaining to referrals of individuals for audit based on information in [501(c)(4)] applications." *Id.* ¶ 4.

Although the search located documents related to "the referral for audit of *entities* that have applied for recognition [under Section 501(c)(4)]," it "located no documents relating to referring *individuals* for audit based on information in [501(c)(4)] applications." *Id.* (emphasis in original). The search also involved a review of sections of the Internal Revenue Manual applicable to the division, but that review located "no . . . provisions that specifically address referrals of individuals based on information contained in [501(c)(4)] applications." *Id.* Finally, the IRS contacted "all senior managers" in the unit that processes 501(c)(4) applications and those with "oversight responsibilities for audit selection and/or referrals" in an attempt to "determine if they have any recollection of any internal directives or guidance" during the relevant period. *Id.* None of these individuals had any memory "of any internal directives or guidance related to referring individuals for audit based in information contained in [501(c)(4)] applications." *Id.*

## II.  Summary Judgment in a FOIA Case

Summary judgment is granted when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002). In determining whether a genuine

issue of fact exists, the court must view all facts in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Under FOIA, all underlying facts and inferences are analyzed in the light most favorable to the FOIA requester; as such, only after an agency proves that it has fully discharged its FOIA obligations is summary judgment appropriate. *Moore v. Aspin*, 916 F. Supp. 32, 35 (D.D.C. 1996) (citing *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1350 (D.C. Cir. 1983)). "FOIA cases typically and appropriately are decided on motions for summary judgment." *Gold Anti-Trust Action Comm. v. Bd. of Governors of Fed. Reserve Sys.*, 762 F. Supp. 2d 123, 130 (D.D.C. 2011) (quotation marks omitted).

In considering a motion for summary judgment under FOIA, the court must conduct a *de novo* review of the record. *See* 5 U.S.C. § 552(a)(4)(B). The court may award summary judgment on the basis of information provided by the agency in affidavits. *See Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981); *Vaughn v. Rosen*, 484 F.2d 820, 826-28 (D.C. Cir. 1973). Agency affidavits must be "relatively detailed and non-conclusory." *SafeCard Servs. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quotation marks omitted). Such affidavits are "accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and

13

discoverability of other documents." *Id.* (quotation marks omitted).

## III. Analysis

The IRS's motion is based entirely upon its claim to have conducted an adequate search in response to Judicial Watch's FOIA request. Because the IRS uncovered no responsive records during that search, a finding that the search was adequate would end this case.

### A.  Law Regarding the Adequacy of a Search.

The standard for assessing the adequacy of an agency's search in response to a FOIA request is a familiar one:

> To prevail on a motion for summary judgment regarding the adequacy of a search, an agency must show "beyond material doubt . . . that it has conducted a search reasonably calculated to uncover all relevant documents." "The issue is not whether any further documents might conceivably exist but rather whether the government's search for responsive documents was adequate." The standard is one of reasonableness, and is "dependent upon the circumstances of the case." To establish the adequacy of its search, an agency may rely on affidavits and declarations which are "relatively detailed and nonconclusory and . . . submitted in good faith."

*Shurtleff v. U.S. Environmental Protection Agency*, 991 F. Supp. 2d 1, 9 (D.D.C. 2013) (quoting *Weisberg*, 705 F.2d at 1351) (alterations in original). "There is no requirement that an agency search every record system," but "the agency cannot limit its search to only one record system if there are others that are likely to turn up the information requested." *Oglesby v.*

*U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).
Additionally, "the 'mere speculation that as yet uncovered
documents may exist does not undermine the finding that the
agency conducted a reasonable search for them.'" *DeSilva v. U.S.
Dep't of Hous. & Urb. Dev.*, 36 F. Supp. 3d 65, 71 (D.D.C. 2014)
(quoting *SafeCard*, 926 F.2d at 1201) (alteration omitted).

Consistent with the need for a "reasonable" search, the cost
or burden of a potential search is also a factor in evaluating
whether the search conducted was adequate. "FOIA 'was not
intended to reduce government agencies to full-time
investigators on behalf of requesters.'" *Cunningham v. U.S.
Dep't of* Justice, 40 F. Supp. 3d 71, 84 (D.D.C. 2014) (quoting
*Judicial Watch v. Export-Import* Bank, 108 F. Supp. 2d 19, 27
(D.D.C. 2000)). For that reason, "an agency is not required to
undertake a search that is so broad as to be unduly burdensome."
*Id.* (citing *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885,
891 (D.C. Cir. 1995)); *see also Freedom Watch v. CIA*, 895 F.
Supp. 2d 221, 228 (D.D.C. 2012) ("An agency need not honor a
FOIA request that requires an unreasonably burdensome search.")
(quotation marks and alteration omitted). A costly and time-
consuming search with minimal chance of revealing responsive
records may not be necessary. *See, e.g.*, *Ancient Coin Collectors
Guild v. U.S. Dep't of State*, 866 F. Supp. 2d 28, 33-34 (D.D.C.
2012) (search was adequate despite agency's failure to search

backup recordings where the cost would be prohibitive and the
likelihood of uncovering responsive information was low);
*Schrecker v. Dep't of Justice*, 217 F. Supp. 2d 29, 35 (D.D.C.
2002) ("[T]o require an agency to hand search through millions
of documents is not reasonable and therefore not necessary," as
agency already had searched "the most likely place responsive
documents would be located."), *aff'd*, 349 F.3d 657 (D.C. Cir.
2003).

**B.   Judicial Watch Largely Conceded that the IRS's Initial
      Search Was Sufficient to Show that No Referrals of
      Individuals for Audits Took Place.**

The IRS asserted in its motion that its various searches fully
discharged its responsibilities under FOIA because by
determining that the Tax Exempt and Government Entities Division
had not referred any individual for audit based upon information
contained in a 501(c)(4) application, the IRS could reasonably
conclude that no records exist that are responsive to Judicial
Watch's request. *See* Mot. at 14-19. Judicial Watch did not
controvert these assertions directly; rather, it expressed
suspicion of this finding, implying that communications,
informal referrals, or guidelines must exist. This suspicion
raises three issues: (1) whether the IRS's explanation of its
audit-referral process or its search of records regarding that
process may be inaccurate or incomplete; (2) whether the IRS
needed to search for "internal directives, memorandums, meeting

notes, agendas, etc" that might also be responsive, Opp. at 3;
and (3) whether the IRS was required to conduct searches to
obtain "communications or discussions about using 501(c)(4) tax
exempt applications for audit referrals generally." *Id.*

As to the first issue, Judicial Watch bases its suspicion that
referrals nonetheless occurred on a handful of concerns.
Judicial Watch has allegedly learned in connection with a
different FOIA request that IRS officials communicated with the
Department of Justice "about criminally prosecuting signers of
applications for 501(c)(4) tax exempt status based on allegedly
false information contained in applications." Pl.'s SMF at 18 ¶
1. How that bears on whether the IRS referred individuals
internally for *audit* based on information contained in a
501(c)(4) application is entirely unexplained. Judicial Watch
also claims that an IRS official "acknowledged that donor lists
generally were neither needed nor used in making determinations
on tax exempt status," but "the IRS required certain applicants
for 501(c)(4) tax exempt status to submit lists of donors to
their organizations as part of the application process, and
nearly one in ten donors identified on such donor lists were
subject to audit." *Id.* ¶¶ 2-3. The IRS asserts that even
assuming this evidence is admissible, proving that individuals
who happened to be listed on 501(c)(4) donor lists were selected
for an audit would not demonstrate that the IRS selected the

17

individual for audit based upon her presence on such a list. *See*
Reply at 5-6. Donor lists, moreover, are submitted to the IRS
for other purposes, so it is meaningless that they may have been
received by IRS officials. *See id.* at 6. Any correlation between
a name on a donor list and an audit cannot, without more,
overcome the presumption that the IRS's detailed explanation of
its audit-referral processes and its search thereof was complete
and correct in determining that no responsive referrals occurred
during the relevant time period. Accordingly, Judicial Watch's
indirect attack on the IRS search of all locations in which a
record of a referral of an individual for audit based upon
information gleaned from a 501(c)(4) application is rejected,
and Judicial Watch failed directly to challenge or cast doubt on
the adequacy of the search recounted in the IRS's motion.

C.   **The IRS's Supplemental Search for Guidance or Directives Was Adequate.**

The second issue raised by Judicial Watch is the possible
existence of internal guidance regarding the use of 501(c)(4)
application information to prompt individual audits. Although
the IRS may not have been required to search for such records
because its searches of the records of various divisions
concluded that no such referrals had been made, the Court need
not address this issue because the IRS conducted a search for

such documents.[3] The Court accepts the good faith and detailed
declaration of the Director of the Exempt Organizations Unit of
the Tax Exempt and Government Entities Division, who stated that
any guidance or similar records would either be on the
Division's "intranet website" or would be found in applicable
"sections of the Internal Revenue Manual." Second Ripperda Decl.
¶ 3. Ms. Ripperda directed a review of the various materials on
that portion of the intranet website, as well as the relevant
sections of the Internal Revenue Manual, but the search
uncovered nothing regarding the referral of individuals. *Id.* ¶
4. Ms. Ripperda also oversaw a survey of senior managers in the
units that process 501(c)(4) applications and that oversee audit
selections and referrals. *See id.* No one could recall the
existence "of any internal directives or guidance related to
referring individuals for audit based on information contained
in [501(c)(4)] applications." *Id.* The IRS therefore determined
that no such guidance materials exist. Absent any reason to
doubt the declaration—which is accorded a presumption of good

---

[3] Judicial Watch has not challenged the IRS's submission of
supplemental materials regarding an additional search conducted
while summary-judgment briefing was ongoing. The Court presumes
that Judicial Watch's silence—neither seeking to file a surreply
nor otherwise asking the Court for relief—means that it has no
objection to the Court's consideration of these supplemental
materials. *See DeSilva*, 36 F. Supp. 3d at 72 (citing *Judicial
Watch v. FDA*, 514 F. Supp. 2d 84, 89 n.1 (D.D.C. 2007); *Vest v.
Dep't of Air Force*, 793 F. Supp. 2d 103, 121 (D.D.C. 2011)).

faith, *see SafeCard*, 926 F.2d at 1200—the Court finds that the
IRS identified all record-keeping systems that might contain the
guidance documents sought by Judicial Watch and searched them
thoroughly.

> **D.   The IRS Need Not Search for Communications because it
> Reasonably Concluded that No Relevant Referrals Had
> Occurred and Further Searches Would Be Unduly Burdensome.**

The IRS argues that its findings that there are neither
official directives nor guidance regarding the use of
information in a Section 501(c)(4) application and that no
individual audit referrals took place based upon information
gleaned from a Section 501(c)(4) application make it unnecessary
to search for further documents, including communications, on
the subject. *See* Reply at 8–9. The IRS has also indicated that
any search of the email accounts of its employees for
communications that might pertain to a decision to select or not
to select an individual for an audit based upon information in a
501(c)(4) application would require the search of approximately
16,000 employee email accounts (of individuals in 442 different
cities), between individuals who worked in offices that process
501(c)(4) applications, those who conduct individual audits, and
those who have policy-making authority over audit decisions. *See*
Declaration of Elise Hellmuth ("Hellmuth Decl."), ECF No. 23-4 ¶
3. Judicial Watch is correct that the IRS has a central server
for the storage of employee emails, but that server has an

approximate limit of 6,000 emails per employee—any email over
that limit may be archived and saved locally. *See* Declaration of
Neguiel Hicks in *Judicial Watch v. IRS*, No. 14-1039, Ex. to
Pl.'s Opp. ¶¶ 6-7 (hereinafter "Hicks Decl."). These archived
emails would be solely in control of the individual employee—
wherever he or she may be located. *See id.* ¶ 7. As the
declaration relied upon by Judicial Watch notes, there is no
method for the IRS to search these locally saved emails for
16,000 employees, so the IRS would need to collect files from
each employee individually. *See id.* ¶¶ 4-10. The declaration
relied upon by Judicial Watch was filed in a case in which
approximately 2,200 employees would have been implicated; there,
the estimate was that a few years would have been needed to
respond, using multiple full-time employees. *See id.* ¶¶ 26-27.
The burden here would be greater.

   The IRS argues that this incredible burden is especially undue
because of the unlikelihood that anything responsive would be
uncovered. The IRS's other searches establish—and Judicial
Watch's evidence has not controverted—that no individuals were
referred for audit based upon information gleaned from a Section
501(c)(4) application. Therefore, it is speculation at best to
say that there exist communications discussing decisions to
audit an individual based upon 501(c)(4) applications. And it is
well-established that "an agency is not required to expend its

limited resources on searches for which it is clear at the outset that no search would produce the records sought." *Cunningham*, 40 F. Supp. 3d at 83. Even if there were a small likelihood of success, the Court, according the IRS's affidavits the appropriate presumption of good faith, finds that the IRS has established a very significant burden that would render Judicial Watch's proposed search unreasonable. *See, e.g.*, *Wolf v. CIA*, 569 F. Supp. 2d 1, 9 (D.D.C. 2008) (search of microfilm files that would take an estimated 3,675 hours and cost $147,000 was unreasonably burdensome, especially in light of the fact that responsive films might not exist); *People for the Am. Way v. U.S. Dep't of Justice*, 451 F. Supp. 2d 6, 13–14 (D.D.C. 2006) (searching 44,000 files manually and expending at least 25,000 hours of work to do so would be unduly burdensome).[4]

---

[4] Judicial Watch also appeared to seek to broaden its initial FOIA request so that it would uncover communications that may pertain to decisions *not* to audit individuals based on information contained in a 501(c)(4) application. *See* Opp. at 3–5. The initial request was for "[a]ny and all records and communications concerning, regarding, or related to the selection of individuals for audit based on information contained in 501(c)(4) tax exempt applications." Compl., ECF No. 1 ¶ 5. The IRS correctly notes that the phrase "selection of individuals for audit" most naturally reads as describing those situations in which an individual was chosen to be audited; not to include decisions not to audit a particular individual. *See* Reply at 17. Nor does the use of the broadening words "concerning, regarding, or related to" transform the request into one for any records related in any way to information in a 501(c)(4) application and decisions not to audit a particular individual. Such a reading, moreover, would begin to render Judicial Watch's request unduly vague. *Cf. Sack v. CIA*, 53 F.

## IV.   Conclusion

For the foregoing reasons, the Court **GRANTS** the IRS's motion

for summary judgment. An appropriate Order accompanies this

Memorandum Opinion.

**Signed:**      **Emmet G. Sullivan**
               **United States District Judge**
               **July 3, 2015**

---

Supp. 3d 154, 164 (D.D.C. 2014) (use of the phrase "pertaining
in whole or in part" rendered a FOIA request unduly vague as "a
record may pertain to something without specifically mentioning
it," making it impossible for the responding agency to know what
is actually sought).